May it please the court. I'm glad to say I've been to Iowa and had a good time. This is a troubling case. What's your connection with Iowa? Just that I spent some time there visiting. Oh, good. That's all. This is a troubling case. It's troubling that Mr. Aguilar is condemned to prison for the rest of his life despite the facts that there was no physical evidence to connect him to this crime, despite the fact that he had no motive to commit the crime, despite the huge disparity between Mr. Aguilar and the description of the killer that the eyewitnesses gave to the police immediately after the crime. They said that the killer was a high school kid, 15 to 17 years old and short. They described him as somewhere between 5'2 and 5'5. Mr. Aguilar was just shy of 21 years old and he was tall, 6 feet tall. At the time of his arrest, was he 6 feet or was he 5'11? Well, could have been 5'11, but some say 6 feet. But he was tall. He was tall. The conviction in this case is based entirely on the testimony of those eyewitnesses, eyewitnesses who violated a court order not to discuss the case amongst themselves before they testified and at least two of whom changed their estimates of the killer's height when they testified to the jury, increasing it to bring it more in line with Aguilar's height. We know that the jury relied on that testimony, that they found it reliable. At least most of the jurors did. We know that one juror in particular, juror number two, did not find that testimony reliable because he was the juror who saw them discussing the case with each other in the hallway immediately before they testified. It's a terrible fact that innocent people are convicted all the time because of mistaken eyewitness identifications. This county alone, sorry? You said something there, convicted all the time because of? Mistaken eyewitness identifications. In fact, Los Angeles County has seen three exonerations this year alone because of mistaken eyewitness identification. If I can get you to build on that, we all know that eyewitness testimony has problems. Yes. The eyewitness identification was, of course, bolstered by the dog identification. Well, yes. Was there anything to link Mr. Aguilar to the white Volkswagen other than the dog scent identification? Well, the only thing that could possibly be a link is that he was a member of the Puente gang, and the owner, the person who bought the stolen Volkswagen, Ballesteros, was also a member of that gang. That's the only link. Other than the? Other than the dog scent. So that's the only thing that we have that places him in that vehicle at any time? If one relies on the dog scent evidence. And, of course, Well, that's what I'm after. I'm after the question of materiality under Brady. Right. And, of course, the Attorney General herself says, well, it really didn't place him in the vehicle on the date of the murder. I believe it's fair to say that Mr. Moniz concedes that it didn't go that far, even though that, of course, was what the prosecutor urged the jury to find. Otherwise, it would have been completely irrelevant. But the dog made some earlier misidentification. Correct. And that information was kept from defense counsel. That's correct. It's Brady information. Yes. And despite the government's attempt now to downplay the dog sniff evidence, if you read Mr. Camacho's rebuttal closing argument, which actually, if you read both his closing arguments, if you looked in the dictionary under the term sandbag, you'd see this closing argument, because he didn't mention any of the facts in his opening. And then he waits until the defense lawyer gives the closing, and then he unloads. But the thrust of his argument is the dog sniff evidence. He mentions it six different times, and he closes with it. That's the last thing he tells the jury before he sits down is how significant the dog scent evidence is. So for the government to turn around now and say it's not material, well, they may believe that, but it was certainly material to Mr. Camacho, wasn't it? He certainly argued that it was. He said to the jury, if you acquit Mr. Aguilar, you're believing that there's a smeller-like person here, namely Richard Osuna. And I'll get to Richard Osuna in due course. It's my submission to the court that the state court's opinion and decision in this case was objectively unreasonable. Now, I'm well aware that AEDPA is highly deferential to the state court's decision, but the deference has limits. And it doesn't mean that this court has to accept a state court decision that is objectively unreasonable because it overlooks a crucial fact. The crucial fact in this case is that juror number two's observation of the eyewitnesses discussing the case before they testified was enough by itself, without anything more, to undermine his confidence in the reliability of their evidence. Now, the state court said, well, he couldn't say exactly what they were saying to each other. He said he heard only parts of their conversation, but that didn't matter to him. He said, I can't say, having seen these witnesses talking to each other, that I can believe what they say beyond a reasonable doubt. And we know that the other jurors relied very heavily on what those eyewitnesses said. They said to juror number two in deliberations, this is on the record, the evidence given by these eyewitnesses matches perfectly. Can't you just rely on them? And he said to the court, I can't rely on them, having seen what I saw. Now, that fact, the state court of appeal dismisses, saying, well, it's just speculation, what they said to each other. It might have been a basis for development of more evidence, but it's not enough by itself. But clearly it was enough by itself for juror number two to feel he had reasonable doubt about the prosecution case. And if that evidence, those observations gave him reasonable doubt, a reasonable, fair-minded juror by any standard, it seems, I submit to the court, that it's objectively unreasonable to say there's no reasonable probability that it would have a similar effect on some other jurors. Well, the judge, you said, actually brought the prospective witnesses into the court and admonished them not to discuss the case among themselves, among the witnesses? He made an order in open court. The record doesn't say whether any of those eyewitnesses were in court when he made the order, but he made the order and either directed or assumed that the district attorney would admonish the witnesses that they mustn't talk to each other. But the violation of the court order is one thing. It's the fact that they discussed the case with each other. Now, when juror number two was excused, how did that come about? Because juror number two was honest about the effect. Yeah, I know, but what were the mechanics? The judge said, I'll have to excuse you because something that happened. Where did this take place, in open court? It took place either in open court or in chambers with everybody present. I don't know. I mean, where did the judge say, where was the judge when he said to juror number two, I'm going to have to excuse you? And he was the holdout. Is that right? We don't know. They didn't disclose any vote. Huh? They didn't disclose any vote up to that point. We don't know. Okay. So where did this take place, in chambers? He called them. Notes were passed? No. He reported to the bailiff on the third day of deliberations that he needed to talk to the judge. On the morning of the fourth day, the judge either called him into open court or into chambers with counsel present. Counsel were present. And called juror number two in. Yes. Okay. And juror number two. And the rest of them were back in that jury room. Yes. All right. Okay. And the judge said, well, because you saw something outside of the evidence presented at trial and it is influencing you, I have to excuse you. And that was proper. But at that point, defense counsel moved for a mistrial on the ground that in order to present a complete defense, he needed to call juror number two as a witness to tell his observations to a new jury so that they could consider the fact that the eyewitnesses discussed the case before they testified. He didn't know what they were discussing. He did know that they were discussing the murder. Yes, he did. And how many of the witnesses were there in that little group? Four. Which ones were they? We know Victor Jara was there. We know Desiree Hoffer. We know Miss Renee Valez was there. There were only two others, Laura Jara and Kevin Feeney. So just give me those names again. Who was there? Victor? Victor Jara. Yes. Who increased his estimate of the shooter's height. Yes. Desiree Hoffer. Yes. Who did the same. Yes. Who was the one who was driving and slammed on the brakes. Yes. Okay. And we don't know whether it was Laura Jara or Kevin Feeney, although Kevin Feeney definitely was in court that day. The record shows that. So maybe Laura Jara, maybe Kevin Feeney. Correct. Okay. I invite the courts to consider an analogy. Suppose someone is eating in a restaurant, gets up, goes to the back of the restaurant to use the restroom, and he passes the kitchen. And as he passes the kitchen, he sees the cook scooping up salad from the floor, putting it back in the bowl, and dishing it out. He goes to the manager and he says, I just saw the cook pick up the salad from the floor. I can't eat this salad anymore. I don't trust it. If the manager says, well, we're still going to serve it to everybody else, because the fact that this customer saw the salad on the floor might have affected him, but there's no reasonable chance that it would affect anybody else. Anybody would say, that's simply unreasonable. I'm going to quit eating salads. I'm sorry? You're two minutes over, so let's hear from the government. You know, Julia Child recommended scooping it up. I think my salad days are over. If you watch Doc Martin, they did that there, too. Only there was blood in it. Good morning, Your Honors. May it please the Court. Deputy Attorney General Elaine Timonis for Respondent to Pelley. It's important to look at what the record actually shows in this case in addressing these claims. And in doing that, it's clear that Petitioner hasn't demonstrated that the State Court's denial of his motion for a new trial based on newly discovered evidence in the form of this juror's observations was contrary to or an unreasonable application of clearly established Federal law or involved in unreasonable determination of facts for two reasons. First of all, there is no clearly established Federal law that says a Petitioner or a Defendant has a Federal constitutional right to a new trial based on newly discovered evidence. And Herrera v. Collins makes that clear, in that in that case, they assume there's such a right, but they don't clearly hold it. So one of the What about withholding Brady information? As to that claim, there is clearly established Federal law, and that's Brady. But the State Court reasonably found, and the Federal District Court also found, that the information that wasn't disclosed didn't meet the materiality test. Well, that's ridiculous. Well, materiality The argument was on the ability of the dog to, you know, recognize sense. And this dog was not a very reliable dog. And that dog could have been cross-examined. Put the dog on the stand, and the dog would have, you know, I'm not very good at this. But if the jurors would have known this dog was unreliable, And then you've got eyewitness identification that is inherently unreliable. And then you have these other things that happened here, where they kick a guy off the jury. And, I mean, this is about Well, I don't want to go overboard, but this is not a very good case for the State. And why didn't the State come forward with that information on the dog? What was the dog's name again? The dog was Riley. And let me speak to the Brady. The dog's name was Brady, wasn't it? No, Riley. I thought it was Brady. No. Well, they changed his name to Brady. But anyway, why didn't they come out and say, you know, Riley. Was it Riley? Riley. Riley has other things on his mind. And Riley is not a perfect scenting dog. This failure to That would have been, because most people think that the dog sniffs, that's it. I understand, Your Honor. And the failure to disclose, we can only assume, was inadvertent here. But here's the thing with the How can it be inadvertent? This is a constitutional issue. You must do that. You must ensure that there's a fair trial. Here's the basis that the State Court and the Federal District Court found the evidence not to be material. They're not saying that the dog's mistake wasn't a relevant bit of evidence. But the test is, materiality equates to prejudice. And the test is whether the failure, whether but for the The test is whether, had the evidence been disclosed, the result of the proceeding would have been different. And here, it wouldn't have been. And here's why. The dog scent evidence was generally corroborative of the other evidence in that it linked Petitioner to the Volkswagen used in the crime. It didn't put him there on the date of the murder. And it wasn't the critical linchpin piece of testimony that clinched the case for the prosecution. It wasn't. Let me ask you this, though I'm sure we're on the same page insofar as we are. So are you saying that the State, in fact, had an obligation to turn it over? I think that had the evidence been This is a yes or a no. Are you saying the State had an obligation under Brady to reveal that Brady had that Riley had this record of misidentifications? I think that That's a yes or no. Yes or no. Did the State have an obligation to turn over that evidence? I think that under the materiality test, the answer has to be no. I think that the good practice would have been yes. That I have to say is a preposterous answer. How can you maintain your credibility to us when you give us an answer like that? Well, here's the issue. Really? The test for Brady Okay. If I had been the prosecutor, I would have turned over the evidence. But the test of whether Brady error occurred is the test whether the failure to disclose or rather had the evidence been disclosed, would the results of the trial been different? And the answer to that question is no. And therefore, the Brady error isn't found. So you're going to hide behind harmless error. Is that it? It's what I'm Hide behind that. The ground I'm standing on is the question of materiality which equates to prejudice. Ms. Timonis, on the prejudice issue. This is a trial, Judge. I don't know how you could read Mr. Camacho's closing argument and stand up there with a good faith and say it wasn't material. It's the thrust of his closing argument. And he does it in you know how many times he mentions the look-alike guy and the dog scent? I understand. How many different times? You mentioned that it was six. I don't recall specifically counting. Okay. And then he says we have a built-in safeguard to protect the accuracy of the identifications. And then he goes on to talk about the dog scent as being the built-in safeguard when in fact it's totally, this particular dog, Riley, is totally unreliable. He ends his closing argument with the dog scent. It's replete with saying this is incredible. You can't believe the defense because we have the dog scent evidence. It's not just a question of the timing of it with the 15 days after the car. The way he argues the case in closing, the dog scent evidence is the nail in the coffin to bolster the eyewitness identification. I disagree with Your Honor to this extent. The critical information here was the eyewitness testimony. There was other testimony linking Petitioner to that crime. And most specifically, Desiree Hofer saw Petitioner, whose photograph she identified, get out of the Volkswagen with a gun, run off, and run back a few minutes later to get back in the car. She saw somebody. The question is whether she saw Petitioner. She saw somebody. She saw a man whose photograph she recognized when she was shown, and she looked through hundreds of photographs and ultimately chose his photograph from the lineup. Was she ever shown a photograph of Osuna? Of? Of the other guy, the smell-a-like guy. I don't recall. I don't recall it either. Yeah, it's critical. I believe one of the registered photographs. I've seen photographs of the two of them. They look pretty similar, actually. Do you have the photo lineup here? I don't have it with me, no. Where is it? It's in the record. Well, where in the record? It's in the excerpts of record. Where? And it's also, I believe, it may be in the – No, there's only two pictures I saw of the excerpts. I'm sorry? I only saw two pictures in the excerpt. Yeah. I believe the photographs are in the excerpts. Tell me where they are. You should have the excerpts with you. Do you have them? I have some of them in my bag, but I don't – See if you can find them. I'll look for them. I believe they may also be in the clerk's transcript, and we lodged the entire record in the – It's possible we're at cross-purposes. You're saying that we have photographs of Aguilar and Osuna. I think Judge Pragerson is asking if you have photographs of the entire lineup. Do you have that in the record? I don't believe we do. Okay. Why not? I didn't put the clerk's transcript together. That would be an exhibit in the case, certainly. But the point – but to get back to the issue of the dog scent evidence, there was other evidence linking Petitioner to the car. It was clear from the testimony that was brought out at trial that the dog scent evidence at best put Petitioner in the car at some point, but not on the date. No.  What would you do if Petitioner was near the scene the next day of the murder? Both the prosecution witness testified to that and the defense witness, Strong, testified to that. And Strong also – That's certainly not the way the argument was presented at closing. The prosecutor at closing was very content to sort of slide over the dates on that and say that he was certainly implying, and maybe even saying that he was there on the date of the shooting and that's why it was there. Let me ask you this just to make sure. We've got a number of eyewitness identifications, of course, and we've gone over them and I've read the testimony of all of them. Was any of those witnesses shown a picture of Mr. Osuna? I was looking at that just before the argument, and I believe that there's a reference to at least one of them having been shown his photograph, and I am not certain which one it was. You know, that's an important issue. You don't know which one it was and you don't know where it is on the record? I don't recall. So it may or may not be true. Because until you put my nose in it, I can't be sure. You know, that's just kind of your recollection maybe? I recollect seeing something referring to one of the witnesses having been shown a photograph, but I don't recall which one. That's not good enough. Okay. But the witnesses did identify Petitioner. They – from – three of those witnesses did clearly identify Petitioner from a lineup, from a photographic lineup, you know, a year before the trial. Wait a minute. A photographic lineup or a set of photographs? A set of photographs. So when they saw the picture, they didn't see his height. It was just a mug shot, right? That's right. They looked at his face. And I want to correct a couple of things that my opponent said. There wasn't a big disparity. You know, there weren't big changes in the height estimates given by the witnesses between the time they spoke to police and the time they testified at trial. So the judge's assessment was that Petitioner was 5'4".   He was 5'4". You know, the record doesn't support that. Let me just – Desiree Hofer says that she told the police artist that he was 5'2 or 5'3. Isn't that right? She told – she told him he was 5'2 or 5'3. Is that right or not? Yes. Then she told the artist that he was 5'4". Then at trial she said she thought she told someone he was 5'8 or 5'10, and even the federal court commented that her estimates were all over the place. But Victor Jara testified that he was 5'6". He told police he was 5'6". He told the artist he was 5'6". And at trial he said his estimate was 5'6". Other witnesses said that he was tall. I believe it was Kevin Feeney who was pumping gas nearby described him as tall and slender. The companions of the victim who were in the car said he was tall. So the estimates do include – Let me look at Kevin Feeney. Kevin Feeney is putting gas in his car on the corner 40 yards away roughly from where the shooting takes place. Yes. And then the shooter goes the opposite direction after the shooting. He describes him as tall and slender. Had he done any previous identifications or what do we have in terms of – a lot of these people we say right afterwards. When was the first time we have anything on the record from Feeney in terms of his estimate of height? I believe it's his – it was his statements to police. He described him as tall. I believe. No. We have that at trial. At trial he says, quote, tall and slender. And I looked to see if there's anything that we had in an earlier police statement. I couldn't find one. If there is one, I'd be interested to know it. He told police that the suspect was tall and slender. Where's that in the record? I don't have the page in front of me. Sorry. We – But it's in my brief. When we teach courses on appellate practice, we say you've got to know what's in the record. And you don't know what's in the record. I'm sorry. I don't have the page site handy, but it is in my brief. No, but that's your job. It's in your brief? Where is it in your brief? I got your brief. Thank you. Thank you. Thank you.  Page 5. In the … in Volume 4 of the transcript, it has pages 903 to 908, 912, and 916 to 22. Where is it in your brief? Oh, I'm sorry. Page 5. Page 5. Okay. Hang on a second. 4, Revised Transcript. Let's see if I've got that. I don't have that. I've got that upstairs. Okay. Ms. Timotez, can I ask you a question while Judge Fletcher is looking? I noticed several times Mr. Camacho gave his personal opinion about the credibility of the witnesses. And, of course, the ABA model rules prohibit that. Most state courts prohibit it. Let me give you an example on page 2706 of his rebuttal closing argument. He's talking about the defense witness, Mary Saez, and he said, in my opinion, based on the information that was produced at the trial, she's an incredible witness. She's not believable. She's untrustworthy. Is there nothing under California state law that prevents a prosecutor from giving their personal opinion about the believability of a witness? The prosecutor is allowed to comment on the state of the evidence, and Mary Saez was caught making a number of lies in his statements. You cannot vouch for a witness. Right. But he can say, in my opinion? I don't believe that it's improper under state law, but I think that's not an issue before this Court. Well, it is, because it goes to, you know, I disagree with you, because it's, the way he argued the case was so prejudicial that it makes the dog evidence, dog scent evidence, even more material, in my view. But I know you wouldn't agree with that. I do disagree, Your Honor. It's our view that the dog scent evidence was generally corroborative at best, didn't put Petitioner in the car on the date of the crime, and That's not how the prosecutor argued it. I know that's your position, but it doesn't square with the closing argument that the jury heard. The jury isn't reading your appellate brief. They heard the closing argument. That's what they had to make their decision on. But the jury also heard defense counsel's closing argument, and defense counsel made it clear that both the prosecution and defense witnesses established that the dog scent evidence at best could put Petitioner in the car sometimes after the shooting. So really, it's the jury And that was the defense who was handicapped because the defense had not had a clue that Riley was unreliable. So the defense, as a matter of strategy, quite reasonably adopted, okay, I've got to deal with that as if it's an accurate identification. You know, the evidence of the dog's, quote-unquote, unreliability is evidence that the dog had made two mistakes in the past, one in 1997 And there was an earlier exclusion by a California Superior Court of that evidence because it said Riley's unreliable. I will not allow that evidence in my courtroom. The exclusion was in People v. Mitchell because the court there found for the first time that dog scent evidence should be subject to Califri. And it hadn't been submitted to a Califri analysis in that case. And that was the basis for the exclusion. The mistakes were two, one in 1997 before this dog had been certified as a dog scent identification dog. And that comes out in People v. Mitchell. And the other was in 2001. And so A year before the trial. Apparently, yes. And that is one mistake out of, evidently, according to the testimony in Mitchell, out of, I believe it was 200 training scent identifications and 100 actual lineup identifications. So this dog may not have been as unreliable as Petitioner would like us to believe. That doesn't mean the evidence, you know, wasn't, didn't speak to, you know, or couldn't have come in had it been presented. Well, that could have come in to rehabilitate the dog. Correct. Yeah. Correct. Where's the dog today? I don't know. There's a question of one of the defense counsel, one of the defense witnesses, whether he knew that the dog had been retired and apparently, but I don't know, you know, what the dog's status is at this point. Again, the test is whether the state court reasonably found that, but for the, you know, that had the evidence been disclosed, the result would have been different. And we submit that the result would not have been different. You know what the test is? The test is that if the prosecution puts on a good, clean trial, they're going to be much more successful. That's really, you know, I was on the Superior Court for a number of years, Municipal Court, and the prosecutors that I dealt with, they were pros. And they knew how to put the evidence in and sit down and not try to push the envelope, push the envelope, see what they could get away with. And I used to do in those days and handle, through sentencing, about 120, 125 felonies every month. And, but these were prosecutors that were in my courtroom every day. And so, I mean, that's just, it's too bad that things have turned out this way. And have you read this Ninth Circuit in-bank case of United States of America versus Rachel Alpha Jernigan? I haven't, Your Honor. Well, you know, it's in-bank, and I was on the panel. I didn't write the opinion. It was written by Judge Betty Fletcher. You know, here it is. Here, the suppressed evidence substantially erodes the already questionable value of the eyewitness identifications. Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. You know, of all the various kinds of evidence, it is the least reliable, especially where unsupported by corroborating evidence. So here, the argument is that corroborating evidence is the unreliable dog. And, you know, any of us who've been around for a while knows that eyewitness identification is not reliable. I had a prosecutor that was in my court, the state courts, for a whole year. And he was always arguing about eyewitness identification. Eki Omo, that is the man, you know, he was a Stanford guy, so he'd get very excited about everything. And then I left that bench and went on the federal trial court. And I saw him, oh, a year or so, two years later, at the LA Athletic Club in the gym. And I went up to him, I said, hi, John.  I said, do you know who I am, John? I said, John, I'm Judge Preggerson. Oh, Judge, I'm sorry I didn't recognize you. And I said, John, think of all the times that you were trying to get someone convicted on the basis of eyewitness identification. And you've seen me every day, every working day for over a year. And you couldn't recognize me. So. If I may just point out that in this case, there was defense expert testimony, an eyewitness expert who testified to the frailties of eyewitness evidence, eyewitness testimony. And it was for the jury to consider the testimony of the eyewitnesses and the testimony of the expert, and determine whether they believed those eyewitnesses or not. That may be true, you know, that's the case. But here, you have withhold Brady information. And you've got something back there, these witnesses talking to each other. And you have all the different changes in the heights and all that. So you've got other things. And so I've, I, did the judge give an instruction on the inherent unreliability of eyewitness identification? I don't recall that off the top of my head, I'm sorry, Your Honor. But I did want to make one point about the juror observation, and just correct statements by my opponent about that. What the juror saw was not a conversation that he could unequivocally state was about this case. He heard them talk about a shooting. He deliberately didn't listen. He didn't hear anyone say, I saw this guy shoot. He saw Victor Jara make a gesture. That was it. And I, you know, they could have just as well been talking about what happened in the news that day. And I happened to look to see that on the date that this conversation allegedly took place, the big news story, was the D.C. And this record is as consistent with them having had a conversation about that as about anything to do with this case. And maybe it's stronger to infer they were talking about that because there had been a general instruction to witnesses, whoever was in the court at the time, that they weren't to discuss the case. Well, listen, you're a very good assistant state attorney general. Thank you. And you remind me of a young lady that grew up across the street from me. And she's tough and smart. But if we could only put on clean trials and follow the rules and not do vouching and all the rest of it, just think of this. You could put the Ninth Circuit out of business because there wouldn't be anything to appeal on. That's all. It's a simple lesson. So, thank you. We would respectfully ask that the federal district court opinion be affirmed and the petition be denied and dismissed with prejudice. You don't need to say anything more. You're over your time anyway. You want to hear any more? You want to hear any more? See how thrifty you are. OK, thanks. The matter is submitted.
judges: Bennett, Pregerson, Fletcher